presented, would result in defendant's acquittal. (*People v. Farley* (1979) 90 Cal. App. 3d 851, 865.)

Should this Court believe that the trial court did not have a sua sponte duty to instruct the jury, as indicated above, trial counsel was ineffective for failing to request appropriate jury instructions.

A trial court is required to instruct on defenses when it appears that the defendant is relying upon such a defense, or if there is substantial evidence supporting such a defense and the defense is not inconsistent with the defendant's theory of the case. The duty of the trial court, though, may be limited. A trial court is required to instruct on general principles. But, if an instruction "relates 'particular facts to the elements of the offense charged,' it is a pinpoint instruction and the court does not have a sua sponte duty to instruct." (*People v. Middleton* (1997) 52 Cal. App. 4th 19, 30.)

Since section 197 was enacted in 1872, and last amended over forty years ago, there is no reason for any criminal defense attorney not to know of its existence. Faced with a fact situation suggesting self-defense, defense of habitation, and apprehension of a felon, there is no reason not to request such instructions should the trial court fail to provide the jury sua sponte with the general principles of law contained therein. Failing to request instructions based upon those principles means that trial counsel's performance fell below an objective standard of reasonableness.

As indicated above, appellant was prejudiced by the failure of the jury to receive the principles of law encompassed in section 197. Had the jury received those principles the results of the proceeding would have been different. Appellant suffered prejudice because of trial counsel's deficient performance and the convictions must be reversed.

## III.

## THE PROSECUTOR ENGAGED IN IMPERMISSIBLE MISCONDUCT. APPELLANT'S CONVICTION MUST BE REVERSED.

A prosecutor's rude and intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process. (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 642-643.) A prosecutor's conduct that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. (*People v. Morales* (2001) 25 Cal. 4th 34, 44.)

Prosecutors, due to their unique function in representing the sovereign interests of the State, are held to an elevated standard of conduct. (*People v. Hill* (1998) 17 Cal. 4th 800, 819-820.) The prosecutor represents "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in criminal prosecution is not that it shall win a case, but that justice shall be done." (*Berger v. United States* (1935) 295 U.S. 78, 88.)

"Prosecutors who engage in rude or intemperate behavior, even in response to provocation by opposing counsel, greatly demean the office they hold and the People in whose name they serve." (*People v. Espinoza* (1992) 3 Cal. 4th 806, 820.)

Appellant need not show that the prosecutor acted in bad faith; nor is his claim of prosecutorial misconduct defeated by a showing that the prosecutor actually acted with a good faith belief that his or her conduct was not wrongful. Misconduct, therefore, need not be intentional to constitute reversible error. (*People v. Hill, supra*, 17 Cal. 4th at pp. 822-823.)

Misconduct on the part of the prosecutor that infringes upon a defendant's constitutional rights mandates reversal of the conviction unless the reviewing court determines, beyond a reasonable doubt, that the misconduct could not have affected the jury's verdict. (*Chapman v. California, supra*.) A violation of state law is cause for reversal when it is reasonably probable that a result more favorable to the defendant would have occurred had the prosecutor not engaged in the improper behavior. (*People v. Watson, supra*.)

## A.    Closing Argument.

The prosecutor argued the following:

"Please do not be distracted by the let's-trash-on-the-victim defense. I hear that in every case. Let's trash the victim. Let's distract you from what really happened and trash on Daryl. Yes, he's a thief. Yes, he smokes crack. Yes, he probably committed a burglary that day when he got immunity. That wasn't

22

discussed, but he'd like to bring it up so that's fine. Yes, we have a person who we would probably not invite over to our homes for Christmas dinner in a few weeks, okay. So what? Prostitutes can be raped, and crackheads can be stabbed.

The same reason that a defendant was convicted of robbery, the same reason that Daryl was on probation after being convicted for his misdemeanor crimes, it's the same reason that Daryl should now be protected is because there are laws in effect that protect us and there are laws in effect that protect people who commit crimes.

Just because Daryl smokes crack doesn't mean he deserves to be stabbed. Just because Daryl's a thief doesn't mean he deserves to get stabbed.

This is not his fault. Why did the defendant call the police? I'm not sure. It is very odd. And like Detective Taylor, I'm not a trained psychologist. I can't read people's minds. But what I do know is that East Palo Alto is a dangerous place because of people like the defendant who think it's perfectly fine to stab another human being and then laugh about it later while describing it because that person stole from him.

Once again, we are not barbarians, we have laws. Defendant seems to be somewhat of a barbarian. He seems to be somewhat nonchalant about this stabbing quite frankly. Not once have I heard the defendant express remorse for what he did. Not once have I heard him say he's sorry. Not once did he inquire that night about Daryl in his interview, not once.

23

If I stabbed someone, I would wonder if they were still alive or hurt. I would ask at least. Not this man. Instead, this man is laughing during his interview. I don't know what a sociopath is, but he's probably pretty close. I have never seen such a nonchalant, indifferent, nonremorseful describing of a stabbing by an individual as I have in this case by the defendant.

So he probably thought that once he called the police, and went outside, and grabbed his two knives he could stab him. This all happened within five minutes according to Karen. And living in East Palo Alto, he probably knows what the response time is for the police officers. Who knows. Bottom line is he wasn't justified in doing it under the law and the victim didn't deserve it. He might have deserved to be punched, or slapped, or something else. But that's a different case and that's not why we are here today.

The defendant stabbed another human being, showed no remorse for that stabbing, and it's not justified under the law for that stabbing. And that's all that matters. Trash the victim all you want, go ahead. Draw pictures of Daryl and make paper airplanes if you want in the jury deliberation room. He is not an honorable human being, no. But that does not mean that he deserves to get stabbed. Not at all.

So I would ask you to consider that. Ask you to consider the defendant's personality, his behavior, his demeanor. And, fine, watch the video. This was not a man who was afraid. This was a man who was irritated. And he said that on the stand he was irritated. And like a fly that flies around your head, he called the

24

police, and grabbed the knives, and swatted that fly away, and ran him out of his house like he told the police he did. And defendant is guilty. And I will ask you to convict. Thank you." (RT 455-458.)

## B.   Legal Principles.

Generally, a defendant forfeits his right to advance a claim of prosecutorial misconduct on appeal if his counsel did not object, or move to strike, and request an admonition, or curative instruction unless the objection would have been futile. (See, e.g., *People v. Gurule* (2002) 28 Cal. 4th 557, 651.) But, there are exceptions to the rule. Courts may disregard the contemporaneous objection rule to forestall a claim of ineffective assistance of counsel (see, e.g., *People v. Mitcham* (1992) 1 Cal. 4th 1027, 1044, fn. 5) courts, in their discretion, may review a question that has not been appropriately preserved for review (*People v. Williams* (1998) 17 Cal. 4th 148, 161, 162, fn. 6), courts may determine whether substantial rights are affected and reverse even if no objection (*People v. Anderson* (1994) 26 Cal. App. 4th 1241, 1249), and courts may consider important questions of constitutional law and fundamental fairness even when waived by the parties (*People v. Marchaud* (2002) 98 Cal. App. 4th 1056, 1061).

In the instant case, this Court should reach the merits of this claim of prosecutorial misconduct, even though counsel failed to contemporaneously object because it will forestall a claim of ineffective assistance of counsel, substantial rights of appellant were affected, and the factual underpinnings of issue present important question of fundamental fairness and constitutional law.

25

### 1.   Prosecutor's introduction of "facts" not in evidence.

Statements by the prosecutor of "facts" not in evidence, either because those facts were never offered, or were offered and excluded or stricken, are a highly prejudicial form of misconduct. The effect of such remarks is to lead the jury to believe that the public prosecutor has information that they do not possess. The implication of this additional evidence is that, in the eyes of the jury, the prosecutor is testifying to "facts" that, although worthless as a matter of law, may be devastating to the defendant because of the special regard jurors have for the prosecution. Such argument that goes outside the evidence admitted is also violative of the defendant's Sixth Amendment right to confrontation. (See, e.g., *People v. Bolton* (1979) 23 Cal. 3d 208, 212, 213, 214, fn. 4.)

The prosecutor presented the following "facts" to the jury: 1) in every case she has prosecuted the defense puts on a "let's-trash-on-the-victim defense," 2) that she knows that East Palo Alto is a dangerous place, 3) not once did she hear appellant express remorse for what he did, 4) not once did she hear appellant say that he was sorry, 5) if she had stabbed someone she would wonder if that person was still alive or hurt, she would at least ask, 6) appellant is pretty close to a sociopath, and 7) that she had "never seen such a nonchalant, indifferent, nonremorseful describing of a stabbing by an individual as I have in this case."

All these statements by the prosecutor were testimonial. Her assertions were not related to the evidence in the case and were not subject to cross-examination. (See, e.g., *People v. Bandhauer* (1967) 66 Cal. 2d 524, 529-530.)

26

These comments told the jury that defense counsel, both in this case and generally, was a villain who was unnecessarily attacking the "victim." Here, the prosecutor was "casting aspersions" on appellant's "constitutional right to defend himself and his right to be represented by counsel. A criminal defense lawyer may properly attack a witness' credibility even though that witness is also the victim of a crime. The prosecutor, however, commits misconduct when, through careful use of words, he labels defense counsel as an additional attacker in a prosecution of a violent offense." (*People v. Turner* (1983) 145 Cal. App. 3d 658, 674.)

Additionally, the prosecutor impermissibly argued that appellant was not just a sociopath and a barbarian, but also the most "nonchalant, indifferent, nonremorseful" relater of the facts surrounding a stabbing that she had ever seen. This argument was directed at appellant's character. This description invited the jury to decide the case based upon its own value judgment, and that of the prosecutor, and not the law. (See, e.g., *People v. Herring* (1993) 20 Cal. App. 4th 1066, 1074-1075.)

The prosecutor also stated that Thomas probably committed a burglary earlier in the day "when he got immunity. That wasn't discussed, but he'd [defense counsel] like to bring it up so that's fine."

During the defendant's cross–examination of Thomas at the preliminary examination, the court appointed an attorney to consult with Thomas and determine whether Thomas wished to invoke his right against self-incrimination. (CT 31.) That attorney, ultimately, was able to gain immunity for Thomas. (CT

32.)   In the course of discussions that placed the contours of the immunity agreement on the record the prosecutor indicated that she would offer Thomas immunity as to a potential trespass charge.   The magistrate interrupted the prosecutor and stated that she understood "that there was also potentially a residential burglary charge." (CT 33.) The prosecutor then stated, "[b]ased on my interview with Mr. Thomas, I don't see evidence of that - - and that in terms of the *entry into the home*, what I see as potentially coming into light is at most a trespass and nothing more based upon my interview with him." (CT 33.   Italics added.)

Thomas's lawyer at the preliminary examination did not seem comfortable with this statement.   He stated the following: "In addition to the proffered immunity, I told Ms. Baum I would not need that in writing. I think the record we have created here would suffice, but I would also like to put on the record that the People indicated as well despite the immunity no intention to prosecute for his actions of this day within the realm of things we have been discussing, correct?" The prosecutor then answered "[t]hat's correct." (RT 34-35.)

During jury trial, in the course of direct examination, the prosecutor lead Thomas through the following testimony:

"Q.     Okay. And do you remember the judge interrupting the proceedings and saying I think Daryl might need an attorney; do you remember that?

A.     Yes, I do.

28

Q.      And an attorney very nice attorney Mr. Liberman came to help you; do you remember that?

A.      Yes, I do.

Q.      And after that, do you remember the judge saying on the record and the prosecutor, not me, but another prosecutor saying you now have immunity?

A.      They wasn't going to prosecute me like violate me for probation for being under the influence.

Q.      And you are on probation for driving with a suspended license; is that correct?

A.      Yes, ma'am.

Q.      And, sir, were you worried about this at all before you started testifying?

A.      No.

Q.      Okay. Do you feel that you've received any benefit because you are not going to get in trouble for using drugs that day or trespassing that day?

A.      There wasn't too much they could do to me anyway for that. I mean I wasn't worried about that." (RT 140-141.)

During defense counsel's closing argument he stated the following: "The last thing I want to talk about that I missed is Daryl Thomas and his idea of immunity. I would tend to agree with you that Daryl probably doesn't understand immunity very well. But what Daryl does understand, he gets a walk - - he gets a pass for everything he did that day. He gets a free pass. *And what the prosecutor*

29

*doesn't understand what she was surprised by is that Daryl Thomas committed a residential burglary that day.*" The prosecutor objected to counsel's argument. "Objection, your Honor. I would object. Move to strike *based on our out-of-court discussions.*" (RT 451. Italics added.) The court overruled the prosecutor's objection. (RT 452.)

Here, the prosecutor engaged in unprofessional conduct by intentionally placing before the jury "facts" outside the record. Moreover, her claim, that the charge of burglary was not discussed during the immunity conversation, is not born out by the transcript of the preliminary examination. The comment also impugned defense counsel's character and integrity. "An attack on the defendant's attorney can be seriously prejudicial as an attack on the defendant himself, and, in view of the accepted doctrines of legal ethics and decorum, it is never excusable." (*People v. Hill*, *supra*, 17 Cal. 4th at p. 832.)

### 2.    Impugning defense counsel's character.

During the prosecutor's initial closing argument she stated the following: "The defendant has certainly changed his story since he gave that original statement to police. *He's had to think about it, he's had to talk to a lawyer, he's had time to make a plan of attack. And the law tells you, hey, red flag, there's probably a reason why his story has changed.*" (RT 428. Italics added.)

"The unsupported implication by the prosecutor that defense counsel fabricated a defense constitutes misconduct." (*People v. Bain* (1971) 5 Cal. 3d 839, 847.) Here, the prosecutor, in no uncertain terms, told the jury that appellant

changed his "story" because of his conversations with his lawyer. "The prosecutor's uncalled for aspersions on defense counsel's character and integrity directed the jury's attention to irrelevant matters and were not proper comments on the evidence or inferences to be drawn therefrom." (*People v. Herring, supra,* 20 Cal. App. 4th at p. 1075.) Such an argument is blatant misconduct.

## C.    Prejudice.

The prosecutor's pattern of misconduct was so persistent and offensive that it infected the entire trial with such unfairness as to make the conviction a denial of due process.    In the instant case the prosecutor waited until her rebuttal argument, when defense counsel would have no opportunity to respond, to unload on the defendant with a series of impermissible arguments.    She "testified" concerning "facts" not related to the evidence in the case and not subject to cross-examination. The prosecutor diminished appellant's right to defend himself with her spurious argument that all criminal defendant's attack the complaining witness. Moreover, the prosecutor peppered the jury with aspersions directed at appellant's character.    By calling appellant a barbarian and a sociopath she injected prejudice into the jury's determination by inviting them to decide the case based upon the jury's value judgments and not the law.

Moreover, this impermissible argument was designed to appeal to the passions and fears of the jury. A prosecutor may not urge jurors to convict in order to protect community values, preserve civil order, or deter future lawbreaking.    The vice lurking in these appeals is that a defendant will be

31

convicted for reasons wholly separate from his guilt or innocence. Jurors may be persuaded by such improper appeals to believe that by convicting a defendant, they will help in solving a pressing social evil.

But this was not the end of the prosecutor's egregious actions. She told the jury that appellant and his defense counsel conspired together to fabricate a defense. Her improper disparagement of counsel's character and integrity misdirected the jury's attention to improper matters.

In light of the closeness of the case, it cannot be said that the misconduct in this case did not deny appellant his due process right to a fair trial. (*Chapman v. California, supra*.)

Even under the lesser standard of *People v. Watson, supra,* it is reasonably probable that a result more favorable to appellant would have occurred had the prosecutor not engaged in the improper behavior.

## IV.

## SHOULD THIS COURT BELIEVE THAT THE ABOVE CLAIM WAS WAIVED BECAUSE OF TRIAL COUNSEL'S FAILURE TO TIMELY OBJECT AND ASK FOR AN APPROPRIATE ADMONITION, THIS COURT SHOULD STILL REVERSE THE JUDGMENT BECAUSE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE.

As a general rule, a defendant forfeits his right to advance a claim of prosecutorial misconduct on appeal if his counsel did not object, or move to strike, and request an admonition, or curative instruction unless the objection would be futile. (See, e.g., *People v. Alvarez* (1996) 14 Cal. 4th 155, 186.)

32

In the instant case, counsel failed to interpose an appropriate objection and/or ask for an appropriate admonition or curative instruction. Should this Court believe that such claims of prosecutorial conduct are waived by counsel's failure to timely and specifically object, and that such an objection would not have been futile, appellant submits that he received ineffective assistance of counsel and that such ineffectiveness resulted in appellant suffering prejudice.

Here, the prosecutor's misconduct so pervaded the case against appellant that one cannot have confidence in the outcome. Appellant suffered prejudice and his convictions must be reversed.

V.

## THE COURT ERRED IN ADMITTING THE KNIFE FOUND IN APPELLANT'S ROOM. THE ADMISSION OF THAT EVIDENCE PREJUDICED APPELLANT.

### A.    Factual underpinnings.

Thomas told the jury that when appellant attacked him appellant was holding two knives, one in each hand. (RT 127.) The prosecutor showed Thomas People's Exhibit 5, a knife, and asked Thomas if the knife "appear[ed] to be consistent with one of the two knives" appellant was holding that night. Thomas indicated that Exhibit 5 appeared to be consistent with one of the two knives appellant possessed the night of the incident. When asked if he knew if Exhibit 5 was in fact one of the knives used by appellant or whether Exhibit 5 just looked a lot like it he answered, "I couldn't be for sure. Like I said, he was holding the

33

knives, but I remember seeing a blade and it was long and it was skinny." (RT 128.)

Later, the prosecutor asked Thomas about a second knife. Thomas had been shown two knives and asked if he could identify either or both. He only identified one, Exhibit 5, the brown one. He did not recognize the other knife shown to him. He did say, though, that the second knife was *similar* to the second knife he saw appellant possess the night of the incident in that it was a long and thin. Thomas also said that the knife was *different*. He testified that the second knife "*didn't kind of look like that. It wasn't like that brand new like that.*" (RT 145. Italics added.)

Karen Johnson told the jury that when appellant was walking toward the kitchen after confronting Thomas appellant was holding two knives, one in each hand. (RT 246.)   Karen, though, could not identify either knife. (RT 209.) Additionally, Karen did not see what, if anything, appellant did with the two knives. (RT 247.)

A few days later, Karen went into appellant's room and found a knife in a pile of clothes. (RT 249, 251.) That knife, People's Exhibit 6, looked identical to other knives Karen possessed. (RT 252.)

.Frank Taylor, a detective from the San Mateo County Sheriff's Office, searched appellant's room after the incident. (RT 277, 281.) Inside appellant's room he found a pocket knife and a sheetrock knife with a retractable blade. (RT 281.) Taylor also searched the kitchen, looking for knives. He found a number of

34

knives there. Five butcher-like knives scattered on a counter top. He also located a red sheet metal box that contained eleven large butcher knives. Exhibit 5 was found inside the red sheet metal box. (RT 283-285.)

Later, Taylor spoke with appellant. During the conversation appellant told Taylor that the knife he had that evening had been bent. Taylor then left the interview room and looked at the knives he had recovered from the apartment house. Inside the red sheet metal box he saw a knife with a bent blade. Taylor showed appellant the knife and appellant indicated that Exhibit 5 was the knife he used in his confrontation with Thomas. (RT 308-309.)

**B.   Motion.**

Prior to jury selection defense counsel requested a hearing to determine the foundation and relevancy for admission into evidence as to a knife recovered in appellant's room some days after September 19, 2004. The court indicated that there could not be any mention of the knife found in the pile of clothes "until the court's heard an adequate foundation." (RT 56-59.)

At the hearing Karen Johnson testified that about ten days after the incident she went into appellant's room and found a knife in a pile of clothing. (RT 199-201.) According to Karen, "the room may have already been open [unlocked] before that day" but she was not positive. Karen believed that she used her key to open the room that day because she "normally" kept the room locked. (RT 202.)

Karen identified the knife in question. She indicated that the knife normally was kept in her kitchen but she had "another one like it," and did not

35

know that it was missing. (RT 204.) Additionally, she said that appellant was allowed to use the kitchen and would sometimes eat in his room. She did not know when that knife was taken from the kitchen, whether it was sometime before September 19, on September 19, or after September 19. (RT 207.) Moreover, Karen saw appellant, after the stabbing, drop two knives on the kitchen counter. She could not identify those two knives. (RT 207.)

After hearing from both sides, the court decided that the knife had "potential" probative value and allowed the testimony relating to the finding of the knife. (RT 211-214.) That ruling was erroneous and prejudiced appellant.

## C. The admission of the knife found in appellant's room violated his right to a fundamentally fair trial.

In the instant case there was no relevant link between the knife found in appellant's room a week or ten days after the incident, Exhibit 6, and the crime alleged. The admission of the knife and the associated testimony into evidence was an abuse of discretion and denied appellant due process of law

At trial, appellant maintained that he went outside armed with only one knife. The prosecution put forth evidence that appellant confronted Thomas with two knives. Thomas testified to this fact, though he excluded Exhibit 6 as one of the knives appellant possessed during the confrontation. (RT 145.) Karen corroborated Thomas's testimony concerning two knives. Karen also testified that she observed appellant walking from the living room to the kitchen, and that he

36

was holding two knives, one in each hand. (RT 246.) She testified that appellant dropped those two knives onto the kitchen counter. (RT 207-208.)

One of the knives that appellant dropped on the kitchen counter (Exhibit 5) was recovered by Detective Taylor. It was located in a red sheet-metal like box with ten other large butcher knives. (RT 284-285.)

There was no evidence that the knife found in appellant's room some days after the incident had been used to inflict any injury upon Thomas. In fact, testimony was introduced relating to seventeen other knives, two found in appellant's room and fifteen found in the kitchen (five in the kitchen and ten and Exhibit 5 in the red sheet-metal type box).

Exhibit 6 was irrelevant to the prosecution's case and the erroneously admitted evidence "was of such quality as necessarily prevents a fair trial." (*McKinney v. Rees* (9th Cir. 1993) 993 F. 2d 1378, 1384.) The evidence, Exhibit 6, was not circumstantially corroborative of Thomas's testimony. The fact that Karen saw appellant with two knives shortly after the incident occurred was corroborative of Thomas's testimony. The fact that many knives were located in the kitchen, the location that Karen observed appellant drop both knives, could also have been corroborative of Thomas's testimony. Exhibit 6, though, in no way corroborated Thomas's testimony because Thomas indicated that the second knife shown to him did not look like the knife he saw appellant possess at the time of the incident. (RT 145.)

37

The only purpose for the admission of Exhibit 6, as the court acknowledged, was to demonstrate consciousness of guilt. (RT 212.)

The jury, though, could draw no permissible inference from this evidence. In fact, the prosecutor urged an *impermissible*, and highly inflammatory, inference upon the jury. She told the jury the following: "He grabs two knives. He says only one, and only you can guess why he's sticking with his I-only-had-one-knife story. Maybe it looks better somehow. *Maybe he doesn't want to admit he took one of the knives and cleaned off the blood in his room*. But he grabs two knives." (RT 433. Italics added.)

There was absolutely no evidence that the knife found in appellant's room had drawn blood from Thomas. The knife with the bent blade, Exhibit 5, the one found in the kitchen, was the knife that struck Thomas.

**D.   Prejudice.**

The only purpose of the admission of Exhibit 6 was to prejudice appellant.

Since the admission of Exhibit 6 violated appellant's right to a fundamentally fair trial, the error was of constitutional dimension. The prejudicial effect of the admission of the evidence likely influenced the jury's determination. Therefore, appellant's conviction must be reversed.

The prosecution's argument was that appellant used excess force in stabbing Thomas. According to the prosecutor, the use of a knife, under the facts presented here, was unreasonable. ] Exhibit 6, even though it was never used by appellant, painted appellant as a guilty man.[ He hid the knife in his room so the

38

police could not find it. He, according to the prosecutor's argument, wiped the blood from the knife, thus destroying evidence of the crime, in his room, after the stabbing. A person who would engage in such guilty behavior should be locked up whether they committed the offense or not.

.Appellant suffered prejudice by the admission of Exhibit 6. His conviction must be reversed.

Additionally, it was an abuse of discretion for the court to allow Exhibit 6, and the accompanying testimony, into evidence. The admission of this evidence prejudiced appellant.

## VI.

## THE CUMULATIVE EFFECT OF THE ERRORS REQUIRES REVERSAL OF APPELLANT'S CONVICTIONS

Though criminal trials are rarely conducted in a "perfect" manner, "a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill*, *supra*, 17 Cal. 4th at p. 844.)

In the instant case, the trial court's failure to instruct sua sponte on prevention of a felony, defense of habitation, and apprehension of a felon, the misconduct engaged in by the prosecutor, the failure of the court to exclude highly prejudicial and irrelevant evidence and testimony, and counsel's failures combined to deprive appellant of a fair trial.

At trial, the court's failure to supply the jury with appropriate instructions deprived appellant of a full and fair hearing on his defense to the charged offenses, and the prosecutor's misconduct heightened this error and tarnished the entire proceedings by her malevolent and misguided arguments. Additionally, the court admitted irrelevant and highly prejudicial evidence against appellant. Paired with these errors were counsel's failures to request appropriate instructions and to keep the prosecutor's misconduct from the trier of fact.

Even should the court believe that the individual claims of error are insufficient to reverse the judgment of conviction, the cumulative effect of the errors prejudiced appellant's right to a fair trial. Therefore, because of the cumulative effect of the errors, appellant's convictions must be reversed.

## VERIFICATION

I declare under the Law of the State of California under the penalty of perjury the

above is true and correct.

## CONCLUSION

**THEREFORE**: Petitioner has attempted to prove his innocence.

Petitioner has presented a prima facie showing for relief, if not a clear showing of:

1. The trial court failed to instruct SUA SPONTE on the defense of prevention
   of a felony,Defense of Habitation, and Apprehension of a Felony.

2. Counsel was ineffective in failing to request appropriate instructions.

3. The Prosecutor engaged in impermissible misconduct.

4. The Court erred in admitting the knife found in appellant's room.

. All of these errors combined require this petition for review to be granted.


**DATED:**                          **Respectfully Submitted,**

_____

# EXHIBIT  C

050

January 8, 2005

Dear Mr. Marbardy,

I am writing this letter on behalf of my son Christoper Prater. I am his
only parent living .His mental stability is of great concern to me.
Christopher is under a lot of stress and suffering from a mental disorder
and depression.

I was a nurse for 33 years and 26 of those years I supervised and
coordinated in the department of Mental Health at S.F. General hospital
acute psychiatric day treatment department.

Christopher has always had some stability in his life, but lately he has
displayed some abnormal behavier. He is being treated now and is on
medication. Also he had been diagnosed with a disability that requires
psychological treatment.

Although he is incarcerated he needs to be in a hospital that can give
him the treatment he needs.

I would appreciate your recommendation or help in selecting a hospital
that addresses psychological disorders.

Sincerely,

Pearl V. Prater

049

CHRISTOPHER KYLE PRATER                                    Court Number SC057263A



<u>INTERESTED PARTIES</u>

1) The defendant's attorney, Mr. Gerritt A. Rutgers, provided a packet of documents to this writer regarding the defendant's correctional health records. It was noted in a letter dated December 27, 2004 from Mr. Rutgers, that the defendant suffers from auditory hallucinations and is currently prescribed Risperdal through the VA Hospital in Menlo Park. He is also a polysubstance abuser and has written a number of programs, seeking help for substance abuse and mental health issues. Copies of letters indicating that the defendant applied to several programs including Delancey Street Foundation, Daytop, Cronin House, Cordilleras Mental Health Center, and Recovery Concepts were received.

2) A letter dated January 8, 2005 was received from the defendant's mother. That letter is attached to this report for the Court's review.

<u>MISCELLANEOUS</u>

Records of the DMV reveal that the defendant currently has a suspended driver's license, effective November 4, 2004, for reason of DCSS/Suspended Service: Mailed not Returned, Unclaimed. He has had no convictions, no failures to appear, no moving violations in the past three years, and no accidents.

<u>FINANCIAL</u>

The defendant is currently incarcerated and unemployed. He listed no current income, one asset, a motor vehicle valued at $700 with no unpaid balance, $30 in savings, $20,000 in unpaid loans, including $15,000 for child support and $5,000 for a college loan, and approximately $2,280 in unsecured debt.

<u>PROBATION/PAROLE PERFORMANCE</u>

On January 19, 2005, this writer attempted to reach the defendant's last parole agent, however, our call was unsuccessful. To date, we have not reached the parole agent. A review of the defendant's CII record show that he violated his parole in February 2002.

Respectfully submitted,

By  BRUCE C. MABARDY
Deputy Probation Officer

Approved,

By _____
CINDY L. PERRY
Probation Services Manager I

BCM:gpp
File #122137

12

044

HRISTOPHER KYLE PRATER                                              Court Number SC057263A

## EMPLOYMENT

The defendant has primarily been employed as a truck driver over the past 10 to 12 years. He was last employed as a moving truck driver for five months until January 2004.

The defendant has also had employment as a construction laborer and as a construction company lead foreman.

## MARITAL

The defendant first met Terri Mae Banks in high school. They were married in 1981 and divorced in 1985 as a result of the defendant's cocaine usage. The defendant noted "we both indulged." He stated that they also had various conflicts of interest. They had one child together, now an adult. The defendant stated that he paid child support and last saw his daughter in August 2004. He stated that he did not see his daughter frequently because he remarried and his daughter lives with her mother in Sacramento.

The defendant first met Patricia Ann Brown in 1985. They married in 1986 and divorced in 1995, as a result of the defendant's drug usage. They had no children together.

## HEALTH

The defendant noted that he has high blood pressure and takes medication for this condition.

When he was 12, the defendant had an appendectomy. When he was 13, he broke his left wrist. At the age of 28, he broke his left knee. At the age of 43, he suffered a nervous breakdown with loss of memory.

The defendant stated that his mental health diagnosis is bipolar disorder with acute sensory perception behavioral disorder, along with bipolar, anxiety, and depression. He stated that he was diagnosed with this condition by his doctor at the VA Hospital, Dr. Perrin French. The defendant was in treatment with Dr. French in March 2004.

## MENTAL HEALTH HISTORY

The defendant noted that he first began seeing his psychiatrist, Dr. Perrin French, in March 2004 at the Menlo Park VA Hospital. He stated that he last saw Dr. French in August 2004. The defendant participated in group therapy which he entered for memory lapse due to a nervous breakdown. He stated that his nervous breakdown occurred due to job stress, his being fired wrongfully, homelessness, and having no money. He noted that he was wrongfully fired from a job and filed a case against his employer and won. He stated that this victory was not very satisfying to him because he was homeless at the time and living out of his car.

The defendant noted that his only mental health history is with the VA Hospital in Menlo Park. He stated that he saw another doctor there one time, a clinical psychologist named Joyce Snyder. He stated that he saw Dr. Snyder in 2001 for anxiety and depression problems.

The defendant noted that his primary care physician at the VA Hospital is Dr. Joyce Chin.

7

# EXHIBIT  D

✳ <u>TABLE OF AUTHORITIES</u> ✳

EXCERPTS

OF.

RECORD

✳ <u>TABLE OF AUTHORITIES</u> ✳

EXCERPTS OF RECORD

FROM

APPELLANT'S OPENING BRIEF

"THE COURT DID NOT INSTRUCT THE JURY THAT THE USE OF DEADLY FORCE IS PERMISSIBLE WHEN RESISTING ANY ATTEMPT TO COMMIT A FELONY, WHEN COMMITTED IN DEFENSE OF HABITATION AGAINST ONE WHO COMMITS A FELONY, OR WHEN ATTEMPTING TO APPREHEND ANY PERSON WHO HAS COMMITTED A FELONY."

(P.C. §197, SUBDS. 1, 2, & 4.)

"APPELLANT MAINTAINS THAT THE COURT SHOULD HAVE INSTRUCTED THE JURY BASED UPON THE PRINCIPLES CONTAINED WITHIN THE PROVISIONS OF SECTION 197, AND SUPPLYING THE JURY WITH MODIFIED VERSIONS OF CALJIC 5.10; 5.13; & 5.25."



EXCERPTS (CON'T)

" THE USE OF DEADLY FORCE IS JUSTIFIABLE AND NOT
UNLAWFUL WHEN COMMITTED BY ANY PERSON WHO IS
RESISTING AN ATTEMPT TO COMMIT A FORCIBLE AND
ATROCIOUS CRIME "

(CALJIC 5.10)

" A FORCIBLE AND ATROCIOUS CRIME IS ANY FELONY
THAT BY IT'S NATURE, AND THE MANNER OF IT'S
COMMISSION THREATENS, OR IS REASONABLY BELIEVED
BY THE DEFENDANT TO THREATEN LIFE, OR GREAT
BODILY INJURY SO AS TO INSTILL IN HIM A REASONABLE
FEAR OF DEATH, OR GREAT BODILY INJURY".

(CALJIC 5.16)

THE USE OF DEADLY FORCE IS JUSTIFIABLE AND NOT
UNLAWFUL WHEN NECESSARILY COMMITTED IN
ATTEMPTING BY LAWFUL WAYS, AND MEANS TO APPREHEND
ANY DANGEROUS PERSON WHO HAS COMMITTED A FELONY

(CALJIC 5.25)

EXCERPTS OF RECORD (CON'T)

"THE FACTS PRESENTED IN THE INSTANT CASE
SATISFY THE REQUIREMENTS FOUND IN 'CEBALLOS'.
BURGLARY, ACCORDING TO CEBALLOS, HAS BEEN
INCLUDED IN THE GROUP-OF CRIMES WHERE FROM
THEIR ATROCITY, AND VIOLENCE HUMAN LIFE, (OR
PERSONAL SAFETY FROM GREAT HARM) EITHER
IS, OR IS PERSUMED TO BE, IN PERIL".

(PEOPLE VS. CEBALLOS (1974) 12 CAL. 3d. 470, 478)

"AN INDIVIDUAL CHARGED WITH A CRIMINAL OFFENSE HAS
A CONSTITUTIONAL RIGHT TO HAVE A JURY DETERMINE
EVERY MATERIAL ISSUE PRESENTED BY THE EVIDENCE."

(P.C. § 1093, SUBDS. (f) ).

# EXCERPTS OF RECORD (CON'T)

"EVEN IN THE ABSENCE OF A REQUEST, A TRIAL COURT MUST INSTRUCT ON THE GENERAL PRINCIPLES OF LAW RELEVANT TO THE ISSUES RAISED BY THE EVIDENCE; THAT IS, THOSE PRINCIPLES THAT ARE CLOSELY, AND OPENLY CONNECTED WITH THE FACTS BEFORE THE COURT, AND WHICH ARE NECESSARY FOR THE JURY'S UNDERSTANDING OF THE CASE."

(PEOPLE VS. SEDENO, (1974) 10 CAL. 3d 703, 715-716.).

"THE TRIAL COURT MUST THEREFORE INSTRUCT ON EVERY THEORY OF THE CASE THAT IS SUPPORTED BY SUBSTANTIAL EVIDENCE."

(PEOPLE V. GLENN, (1991) 229 CAL. APP. 3d 1461, 1465).

"THE DEFENDANT IS ENTITLED TO SUCH INSTRUCTIONS REGARDLESS OF THE DEFENDANT'S TESTIMONY, AS LONG AS THERE IS SUBSTANTIAL EVIDENCE TO SUPPORT THE INSTRUCTION."

(PEOPLE V. ELIZE, (1999) 71 CAL. APP. 4th 605, 612-613).

EXCERPTS OF RECORD (CON'T)

"UNDER THE SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, THE SUPREME COURT HAS HELD THAT AS A GENERAL PROPOSITION, A DEFENDANT IS ENTITLED TO AN INSTRUCTION AS TO ANY RECOGNIZED DEFENSE FOR WHICH THERE EXISTS EVIDENCE FOR A REASONABLE JURY TO FIND IN HIS FAVOR".

(MATHEWS V. UNITED STATES, (1988) 485 U.S. 58,63.)

"A FAILURE TO PROVIDE THE JURY WITH INSTRUCTIONS ON THE DEFENSE THEORY OF THE CASE INFRINGES UPON APPELLANT'S CONSTITUTIONAL RIGHTS BECAUSE IT STOPS THE JURY FROM CONSIDERING DEFENDANT'S DEFENSE TO THE CHARGES AGAINST HIM, AND FROM MAKING FINDINGS OF FACT NECESSARY TO ESTABLISH GUILT. AN INSTRUCTIONAL ERROR THAT DISTORTS, OR ELIMINATES THE BURDEN OF PROOF APPLICABLE TO A DEFENSE IS SUBJECT TO FEDERAL CONSTITUTIONAL ERROR ANALYSIS.

(PEOPLE V. SPRY, (1997) 58 CAL. APP. 4th 1345, 1371-1372.)

EXCERPTS OF RECORD (CON'T)

"A CRIMINAL DEFENDANT IS GUARANTEED THE RIGHT TO THE ASSISTANCE OF COUNSEL BY BOTH THE SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SEC. 15, OF THE CALIFORNIA CONSTITUTION. CONSTRUED IN LIGHT OF IT'S PURPOSE, THE RIGHT ENTITLED THE DEFENDANT NOT TO SOME BARE ASSISTANCE BUT RATHER TO EFFECTIVE ASSISTANCE"

(PEOPLE V. LEDESMA, (1987) 43 CAL. 3d. 171, 217, 222.)

"DEFENDANT MUST SHOW THAT COUNSEL'S REPRESENTATION WAS DEFICIENT, AND THAT IT FELL BELOW AN OBJECTIVE STANDARD OF REASONABLENESS UNDER PREVAILING NORMS, AND THAT THE DEFICIENT PERFORMANCE PREJUDICED THE DEFENSE.

(STRICKLAND V. WASHINGTON, (1984) 466 U.S. 668, 687.)

[Pg. 6]

EXCERPTS OF RECORD (CON'T)

" A PROSECUTOR'S CONDUCT THAT DOES NOT RENDER
A CRIMINAL TRIAL FUNDAMENTALLY UNFAIR IS
PROSECUTORIAL MISCONDUCT UNDER STATE LAW
ONLY IF IT INVOLVES THE USE OF DECEPTIVE, OR
REPREHENSIBLE METHODS TO ATTEMPT TO PERSUADE
EITHER THE TRIAL COURT, OR THE JURY."

( PEOPLE V. MORALES, (2001) 25 CAL. 4th 34, 44.)


" A PROSECUTOR'S RUDE, AND INTEMPERATE BEHAVIOR
VIOLATES THE FEDERAL CONSTITUTION WHEN IT
COMPRISES A PATTERN OF CONDUCT SO EGREGIOUS
THAT IT INFECTS THE TRIAL WITH SUCH UNFAIRNESS
AS TO MAKE THE CONVICTION A DENIAL OF DUE
PROCESS."

( DONNELLY V. DECHRISTOFORD, (1974) 416 U.S. 637, 642-643;

[ Pg. 7 ]

EXCERPTS OF RECORD  (CON'T)

"THE COURT ERRED IN REFUSING TO GIVE THE FOLLOWING INSTRUCTION: "THE COURT INSTRUCTS THE JURY THAT A PERSON IN THE EXERCISE OF HIS RIGHTS OF SELF-DEFENSE NOT ONLY HAS A RIGHT TO STAND HIS GROUND, AND DEFEND HIMSELF WHEN ATTACKED, BUT HE MAY PURSUE HIS ADVERSARY UNTILL HE HAS SECURED HIMSELF FROM DANGER".

(PEOPLE V. RUSSELL [59 C.A. 2d 660] P.663 [4].)

"A PERSON ASSAILED HAS THE RIGHT TO REPEL FORCE WITH FORCE; THAT HE MAY EMPLOY THE RIGHT TO DEFEND HIMSELF FROM APPREHENDED DANGER TO ANY EXTENT WHICH TO HIM IS APPARENTLY NECESSARY."

(PEOPLE V. RUSSELL [59 C.A. 2d 660] P.663 [1].)

"TO RAISE THE ISSUE OF SELF-DEFENSE, THE DEFENDANT MUST ADMIT THAT HE COMMITTED THE CRIMINAL ACT, BUT THAT HE ACTED," UNDER EXCUSABLY EXTENUATING CIRCUMSTANCES" THAT REMOVED THE KILLING, OR ASSAULT FROM BEING A CRIMINAL ACT."

(PATTERSON V. NEW YORK, 432 U.S. 230), (1977).
(PATTERSON V. NEW YORK, 432 U.S. 197, (1977).

TABLE OF AUTHORITIES

AUTHORITIES FOR EXHIBITS

* TABLE OF AUTHORITIES *

TABLE OF AUTHORITIES

\* AUTHORITIES FOR EXHIBITS \*

A.
EXHIBIT

CONCLUSION:

1.) ROWE VS. UNITED STATES, (1896) 164 U.S. 546, 557, 17 S.CT. 174-175.

2.) GRYGER VS. BURKE, (1948) 334 U.S. 728, 68 S.CT. 1259.

3.) MATTHEWS VS. UNITED STATES, (1988) 485 U.S. 58, 63.

4.) IN RE WINSHIP, (1970) 397 U.S. 358, 25 L.Ed. 2d 368, 90 S.CT. 2450.

5.) UNITED STATES VS. BOOKER, (2005) 543 U.S. —, 160 L.Ed 621, 125 S.CT 738.

6.) MALLOY VS. HOGAN, (1964) 378 U.S. 1, 6.

\* TABLE OF AUTHORITIES \*

# TABLE OF AUTHORITIES

## * AUTHORITIES FOR EXHIBITS *



CONCLUSION:

1). SANDSTROM VS. MONTANA, (1979) 442. U.S. 510, 61 L.Ed. 2d 39, 99 S.CT. 2442

2.) CUYLER VS. SULLIVAN, (1980) 446 U.S. 335, 348.

3.) MORAN VS. BURBINE, (1986) 475 U.S. 412, 421.

4.) PEOPLES VS. ROSALES, (1984) 153 CA 3d 353, 200 CR 310.

5.) NEW YORK VS. QUARLES, (1984) 467 U.S. 649, 654.

## * TABLE OF AUTHORITIES *

IRISTOPHER KYLE PRATER

Court Number SC057263A

045



ae defendant related that he believes his mental health is getting better. He stated that he has been prescribed e psychiatric medications Visteril for anxiety/depression (100 mg daily), and Risperdon to control alucinations/voices (4 mg per day). He currently takes both of these medications.

## UBSTANCE ABUSE/TREATMENT HISTORY

he defendant first began the use of alcohol at the age of 13. He stated that he consumed alcohol on a chronic aasis from his teenage years through the military. He stated that he last used over one year ago.

The defendant related that he had alcohol was not a factor prior to his commission of the present offense. He stated that he does believe himself to be an alcoholic and that alcohol is a problem for him.

The defendant first used marijuana at age 13. He stated that he last used this substance in 2003. He related that he used it "every day."

The defendant stated that he first began the use of powder cocaine as a teenager at age 16. He last used it in 2002. He stated that his means of ingestion was through snorting. He stated that this was his primary drug of choice and he would normally use it one time weekly or on the weekends.

The defendant stated that from 1995 to 1996, he snorted heroin "almost every day."

.he defendant stated that he first began the use of crystal methamphetamine in 1996 with means of ingestion through snorting. He stated that he would use this substance during the weekends and stopped using it in 2003.

The defendant noted that he participated in one residential treatment program, Project 90, from November 2002 to April 2003. He stated that he entered that program on a voluntary basis and completed it successfully. When asked why he entered the program, he stated, "truthfully, I went there 'cause I was homeless." The defendant noted that the Project 90 program was a regular program and not a dual diagnosis program.

The defendant stated he has never used drugs intravenously.

## MILITARY

The defendant entered the U.S. Marine Corps in November 1981 and was generally discharged under honorable conditions in March 1984. He stated that the reason for his general discharge was that he was having problems with his daughter at the time and that his ex-wife left her with various people and the defendant had to go and find her. The defendant served as an aircraft mechanic for the Marines.

The defendant entered the U.S. Army in 1985 and was honorably discharged in 1993. He stated that he served in a field artillery unit and as a supply clerk.

1    • INTERVIEW OF CHRISTOPHER PRATER                                    0 0 2

2    Case Name/Number: People vs. Christopher Prater // SC57263

3    Date and Time: September 20, 2004 approx. 0255 hours

4    Location:

5    Present: Detective Frank Taylor // Sergeant Rick Yearman//Christopher Prater

6    (Initials = Name of person speaking)

7    FT:      Frank Taylor, Detective

8    CP:      Christopher Prater

9    RY:      Rick Yearman, Sergeant

10   ――――――――――――――――――――――――――――――――――――――

11   (Unintelligible conversation)

12   RY:     Let's go; let's get this over with, okay.

13   CP:     Man, I'm tired.

14   RY:     Me too.

15   CP:     (Unintelligible)

16   RY:     I came out; I got out of bed to come see you man.

17   CP:     It's not what there doing, what they got nothing?

18   FT:     No, we wouldn't leave you in there.

19   CP:     Mmm, somebody did.

20   RY:     All right, you know it's about seven minutes to three in the morning? You know the uh, date

21          today?

22   CP:     (unintelligible)

23   RY:     Christopher.

24   CP:     Hmm.

25   RY:     Do you know the date today?

003

| | | |
|---|---|---|
| 1 | CP: | (Unintelligible) um. |
| 2 | RY: | Twentieth of September, does that sound right? |
| 3 | CP: | Yah. |
| 4 | RY: | Monday morning. |
| 5 | CP: | Okay. |
| 6 | FT: | Chris, my name's Frank Taylor, and I'm a detective with the Sheriffs Office. And that's Rick |
| 7 | | Yearman, he's a sergeant with the Sheriffs office and you met him earlier, right? |
| 8 | CP: | Uh-uh. |
| 9 | FT: | No, okay. All right Chris, what's your uh, your name's Christopher? |
| 10 | CP: | Yes. |
| 11 | FT: | And your last name? |
| 12 | CP: | Prater, P-r-a-t-e-r. |
| 13 | FT: | Prater. How old are you right now? |
| 14 | CP: | I'm 42. |
| 15 | FT: | And what's your date of birth? |
| 16 | CP: | Eight fourteen sixty-one. |
| 17 | FT: | Eight fourteen sixty-one. And you live there, usually at 2080 Glen? |
| 18 | CP: | That is one of the places I live, since October. |
| 19 | FT: | Since October? |
| 20 | CP: | End of July, started in July. |
| 21 | FT: | Since July? |
| 22 | CP: | Yes. |
| 23 | FT: | Okay, I guess she selling that house huh? |
| 24 | CP: | Huh, yes, she is. |
| 25 | FT: | She sell that house? And uh, who do you live there with? |

0 0 4

1   CP:   Uh, myself uh.

2   FT:   You, you live there alone?

3   CP:   Uh, it's her house and I rent a room from her.

4   FT:   Okay. All right, I'm going to read you something here just uh, just uh, formality, okay. We

5       uhm, you have the right to remain silent, you understand that? And anything you say can and

6       will be used against you in a court of law, you understand that, right? Okay. And you have the

7       right to talk to an attorney and have an attorney present before or during questioning if you

8       desire, you understand that? Okay, if you can't afford an attorney one will be appointed free

9       of charge to represent you before and during questioning if you desire. You understand these

10      are the rights I explained to you?

11   CP:   M-hmm.

12   FT:   Do you know why you're uh, here tonight?

13   CP:   Uh, investigation.

14   FT:   Investigation about what?

15   CP:   Um, that I tried to rob uh, rob my room.

16   FT:   Okay. So, someone, someone tried to break into your house?

17   CP:   Someone did break into my house.

18   FT:   Who was that?

19   CP:   Uh, his name was uh, Daryl Thomas.

20   FT:   Okay. Do you know where Daryl is right now?

21   CP:   Uh, supposedly he's homeless.

22   FT:   Okay.

23   RY:   Did he go, could we uh, (unintelligible) out of the room, do you go by Randy? Is that what

24      people call you?

25   CP:   No.

0 0 5

| | | |
|---|---|---|
| 1 | FT: | Do you have a nickname of Randy? |
| 2 | CP: | No. |
| 3 | CW: | Okay. Do you know uh, forget the guys name already. |
| 4 | RY: | Long time ago. |
| 5 | FT: | Yah. Do you know uh, Rodney Green? |
| 6 | CP: | Yes. |
| 7 | FT: | He was hanging out there tonight. |
| 8 | CP: | Yup, yeah. |
| 9 | FT: | -Could you tell me about Rodney? |
| 10 | CP: | Uh, supposedly he um, got kicked out by the guy who's taking care of him I don't know, so I |
| 11 | | say well, cause I'm moving from my place to another place. |
| 12 | FT: | Where are you moving to? What's that new address? |
| 13 | CP: | Um, what the hell is it, just a minute. I can't remember right now man, but it's over. |
| 14 | FT: | I understand. |
| 15 | CP: | Somewhere on the other side of uh, freeway. |
| 16 | FT: | Okay. |
| 17 | RY: | Why, why would Rodney refer to you as Randy? |
| 18 | FT: | How long have you known, how long have you known him? |
| 19 | CP: | Who? |
| 20 | FT: | Rodney. |
| 21 | CP: | Uh, it's been about maybe, it about a week or so. |
| 22 | FT: | Okay. Had you known him from, uh, from before? |
| 23 | CP: | No, no. |
| 24 | FT: | And he takes care of somebody, huh? |
| 25 | CP: | Yes. |

006

1    FT:    And that's all you know, you just, you just met him?

2    CP:    Yah, yah, yah.

3    FT:    On the street?

4    CP:    Yah.

5    RY:    He was at your place tonight.

6    CP:    Yah, yah.

7    RY:    What was he doing there?

8    CP:    Cause he said he needed a spot until uh, the (unintelligible), until, I guess the older guy cool

9        off or something like that, so, I know, and uh, on my way to taking him home that's when this

10      guy came knocking on the door. And I heard his voice on the door, that's when I went to the

11      owner and knocked on her door. And then when I knocked on her door and told her, hey uh,

12      the guy that broke into my room is at my door, and um, so she called the police, and so, I, like

13      he's still out there, (unintelligible), didn't know if he's still out there and I thought about my

14      car because I like he's trying to vandalize my car my car, so, then I just grabbed a knife

15      (unintelligible) out of the kitchen and went outside.

16    FT:    I'm sorry, you did what?

17    CP:    Grabbed a knife out of the kitchen to go outside with, I'm thinking like, only cause I told uh,

18      because we about to leave, Rodney, I say hey Rodney, what's his name out there at that door,

19      I say man, don't um, don't answer nothing and don't open it, I don't care what, even of he

20      tries to break, breaks windows or something like that, right. And so I'm thinking that, if I tell

21      Karen and Karen look, he's going to try to vandalize the house or something man, call the

22      police no matter what.

23    FT:    You wanted her to call the police?

24    CP:    Yah. And uh, when she called 9-1-1, it was like, you know, a few minutes till and no response

25      and I'm thinking, ah this man going to mess up my car so, like I went outside. And than as uh,

1        you know approach to see he was like, (unintelligible) my doors at, he come right out of

2        bushes and says, get away from me man..

3    FT:    He said what?

4    CP:    He says, I left a jacket there, so I said man, you crazy, you just robbed my place and now get

5        the hell away from here, all right. And he tried to uh, you know, attack me like this, with his

6        leg and then like, 'cause I guess he didn't expect a knife, and then he's like, I didn't do

7        anything. I said man, get away from me, get out of here man, and than he tried running fast,

8        ran, tried to run him off.

9    FT:    You ran fast?

10   CP:    He did.

11   FT:    He did.

12   RY:    You said your house was burglarized?

13   CP:    Yes, it was.

14   RY:    When?

15   CP:    Let me uh..

16   RY:    When was it burglarized?

17   CP:    That morning. He did it.

18   RY:    (Unintelligible).

19   CP:    The, the landlord seen it.

20   RY:    Okay, you weren't there though.

21   CP:    No I wasn't.

22   RY:    Because the land, the landlord saw it.

23   CP:    Because the landlord saw it.

24   FT:    What was taken?

25   .

008

| | | |
|---|---|---|
| 1 | CP: | CD's, DVD's, um, a little bit, uh, a suitcase of clothes um that pretty much that's it, like |
| 2 | | sixteen DVD's and um, oh, and some VCR tapes about 40 or so VCR tapes. |
| 3 | FT: | How many times had he ripped you off? |
| 4 | CP: | He never did. |
| 5 | FT: | This one time? |
| 6 | CP: | Just this time, yah. |
| 7 | FT: | How did you know it was him? |
| 8 | CP: | Cause I know the landlord say it was him. |
| 9 | RY: | Did you ever say what his, uh, first name is, who is he? |
| 10 | CP: | Hmm? |
| 11 | RY: | The guy that ripped you off, who is he, what's him name? |
| 12 | CP: | Darryl Thomas. |
| 13 | FT: | How do you know him? |
| 14 | CP: | What do you mean how I know him? |
| 15 | CP: | Yah, yah, knew him from the neighborhood, yah, (unintelligible) I grew up in the |
| 16 | | neighborhood. |
| 17 | FT: | About, uh, about how many years have you known him? |
| 18 | CP: | I don't know, no, nothing, nothing like that, it was this, the guy, the guy was homeless, he |
| 19 | | didn't really have no place to go. I met him through, um, another lady friend of mine and so he |
| 20 | | said man (unintelligible) place, I said I tell you what man, if you just stay the day with me, |
| 21 | | you know (unintelligible). So he did and uh, you know, I left, he left. I said hey look, you can |
| 22 | | come here, get your clothes and whatever you know because I'm moving to an apartment woo |
| 23 | | woo. So, just when, when I'm here you call me when you need to get in here and you call me |
| 24 | | other than that, you can't come over here. |
| 25 | FT: | And, what do you know about Darryl? Tell me about his um personality, or his character. |

## PROOF OF SERVICE BY MAIL

I, _CHRISTOPHER PRATER_, declare that I am over 18 years of age, and a

party to the attached herein cause of action, that I reside at California State Prison at

Corcoran, in the County of King, California.

My mailing address is: _P.O. Box 3466, / 3B·03-141L_

_CORCORAN, CA 93212_.

On _July 8ᵗʰ_, 20_08_, I delivered to prison officials for mailing, at the

above address, the attached: _UNITED STATES COURT OF APPEALS Ninth Circuit_

in sealed envelope(s), with postage fully prepaid, and addressed to the following:

(1) _UNITED STATES NINTH CIRCUIT_ (2)

  _U.S. COURT OF APPEALS_

  _95 ⁊ SEVENTH ST_

  _S.F. CA 94103_

(3)_____ (4)_____

I declare under penalty of perjury that the foregoing is true and correct to the best of
my knowledge. Executed this _08_ day of _July_, 20_08_, at
California State Prison, Corcoran.

_Christopher K. Prater_

In Pro Per

## PROOF OF SERVICE BY MAIL

I, _CHRISTOPHER K. PRATER_, declare that I am over 18 years of age, and a party to the attached herein cause of action, that I reside at California State Prison at Corcoran, in the County of King, California.

My mailing address is: _P.O. Box 8800, B303·141L_

_CORCORAN, CA 93212_ .

On _JULY 29_, 20 _08_, I delivered to prison officials for mailing, at the above address, the attached: _PETITIONER'S INFORMAL BRIEF; FOR_

_REVIEW IN NORTHERN DISTRICT COURT._

in sealed envelope(s), with postage fully prepaid, and addressed to the following:

(1) _U.S. DISTRICT COURT_        (2) _____

_FOR THE NORTHERN DISTRICT_        _____

_460 GOLDEN GATE AVENUE_        _____

_SAN FRANCISCO, CA 94102-3483_        _____

(3) _____        (4) _____

_____        _____

_____        _____

_____        _____

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this _29th_ day of _July_, 20 _08_, at California State Prison, Corcoran.

_Christopher K. Prater, V-67110_

In Pro Per